## Hartford Accident and Indemnity Company *v.* Connecticut Bank and Trust Company

Superior Court     Judicial District of     File No. 210962
Hartford-New Britain at Hartford

Memorandum filed November 3, 1982

*Blume, Elbaum & Adams,* for the plaintiff.
*Hoppin, Carey & Powell,* for the defendant.

M. Hennessey, J. The plaintiff as subrogee of Dunham-Bush, Inc., brings this action against the defendant bank for damages alleged to have been caused by the defendant in permitting the deposits of checks made payable to Dunham-Bush into the personal account of one who was not authorized to endorse for Dunham-Bush. The complaint is in five counts. The first count is in contract, the second in negligence, and the third in conversion. The fourth and fifth counts cite §§ 42a-4-213 (3) and 42a-3-419 (a) of the Uniform Commercial Code as additional bases for the accountabil-

ity and liability of the defendant bank alleged in the preceding three counts. In defense of the action the defendant alleges it acted in accordance with reasonable commercial standards applicable to the banking business; that Dunham-Bush is precluded from recovering against the defendant by virtue of its own negligent conduct; that the plaintiff may not recover because it is a compensated surety; and that § 42a-4-213 (3) does not impose any liability against the defendant in favor of Dunham-Bush.

The facts are as follows: During 1975, Charles Currie, general credit manager for Dunham-Bush, took six checks payable to Dunham-Bush, affixed the endorsements of the named payee and then endorsed them for deposit into his personal account at the Connecticut Bank and Trust Company (hereinafter CBT). In each instance, after the purported endorsement of the payee appeared the instruction ''For Deposit Only a/c # 4284186'' which was Currie's personal account. In three cases the endorsement included Currie's own name following the payee name. All six checks were delivered by Currie to the drive-in teller window of the West End Branch of CBT and, with one exception, were delivered together with cash which was also deposited into his account. These transactions always occurred at noontime on busy bank days, usually paydays.

The aforesaid six checks were the last in a series of twenty-five checks which Currie misappropriated over a period of at least three years. The six checks totaled $60,000. The total amount of the twenty-five checks was $165,000. None of these defalcations was detected by Dunham-Bush until December of 1975.

In his capacity as general credit manager in Dunham-Bush's West Hartford office, Charles Currie was responsible for handling the receivable accounts, for

posting those accounts and for issuance of reminder billing statements on those accounts. In 1975 payments on receivable accounts carried in the West Hartford office were sent by mail to that office. The following procedure existed in the West Hartford office in 1975 with respect to the receipt of payment checks and the handling of them: Checks were received in the mail room. These were sometimes delivered to Currie's secretary, Patricia Morris, from the mail room. Sometimes Currie himself would go down to the mail room and bring them up to her. Anyone from the credit department could get these checks from the mail room. Currie's secretary would sort the checks and put them in order for review by the assistant manager. She made out the deposit slips for all checks received during the day at the end of the day. Checks were not endorsed for deposit until the end of the day when Currie's secretary tallied the checks and made up the deposit slip. Checks received during the day were either on the secretary's desk or circulated by her in the credit department for identification. The deposits were mailed out by the secretary at the end of each day. Morris testified that this was her daily deposit routine and that she stayed with it. She also testified that it was unusual to deposit just one Dunham-Bush check, that the number of checks deposited averaged ten or so a day.

The aging procedure in effect in 1975 at Dunham-Bush's West Hartford office for receivables for the month of December, 1975, shows the company with 2.3 million in receivables aged as follows: 0-30 days, $384,000; 31-60 days, $531,000; 61-90 days, $268,000; 91-120 days, $94,000; over 120 days, $1,023,000. A statement was available on each of these customer accounts. Currie as credit manager received these statements and determined whether the statement went to the customer. The system in place in 1975 was unable to pick up customer accounts past due because

funds could be posted from one account to another and a posted payment would kick the account so posted out of the aging sequence it would otherwise have been in. As credit manager Currie made adjustments to accounts.

The corporate financial vice president reviewed the statement of receivable accounts on a monthly basis with the credit manager. Though the vice president had the final word as to write off of these accounts, the vice president used the credit manager, Currie, as the source for information to decide which account to write off.

In 1975, Dunham-Bush had 2 million dollars in domestic accounts and 2.3 million dollars in international accounts. The testimony of Thomas Baker, manager of treasury operations for Dunham-Bush and successor to Currie, was that the corporation had a higher volume than usual of past due accounts, that is, accounts over 120 days old, because of the economic conditions existing at that time.

Annual audits of Dunham-Bush's West Hartford office conducted in 1972, 1973, 1974 and 1975 by Haskins and Sells, certified public accountants, recommended separation in that office of the functions of handling receivables, posting accounts and controlling the issuance of reminder billing statements. This recommendation was not followed by Dunham-Bush. Currie, as credit manager, carried all three responsibilities and continued to do so through the years audited. Benjamin Cohen, certified public accountant, testified that it is normal and good internal control that a person who has the ability to make management decisions in the areas of credits, for example, and to approve write-offs should not have access to cash receipts, nor should he

have access to the record-keeping of accounts receivable. Without this separation of responsibility, there is the possibility of defalcation.

The aforesaid Haskins and Sells reports contained recommendations to rectify the problems identified, which recommendations were not implemented at the time made. One of these recommendations was to list receipts on an adding tape, restrictively endorsing them immediately upon receipt by someone who did not have access to the accounting records or management decisions in regard to credit. Nor would this person be reporting to someone who had that access. If these procedures had been implemented, the defalcations might still have been possible, but they would have been more difficult to accomplish and would have been discovered much sooner.

In 1975, Dunham-Bush maintained a corporate account with CBT entitled "Dunham-Bush, Inc., Treasury Account No. 146838 3." Dunham-Bush conferred authority upon a number of corporate officers and employees to act on its behalf in debiting its funds, pursuant to a corporate resolution prepared on a form furnished by CBT. This resolution did not contain Currie's name. Currie had no authority to make withdrawals on the Dunham-Bush account.

Thomas Keane, vice president of Hartford National Bank, with over twenty years in banking, testified that in his opinion CBT acted in accordance with reasonable commercial standards in the banking business with respect to its handling of the six checks at issue in the present case. Keane stated that it is accepted practice within the banking community to accept for deposit checks that are endorsed and the last endorsement in the deposit is to the account where the deposit is being made. He agreed there is the risk of the first endorsement being fraudulent or invalid or under a claim as

with a standard check that is made payable to the depository account, or, that it may be dishonored for stop payment, or for "No funds" in the account at which time there is the risk of having it come back through the system.

Keane testified that in addition to the banking procedures which are followed, the safeguards of the business billing cycle play an important part in protecting the assets of a bank's customer. Banks are aware of this cycle and structure their own procedures accordingly. The customer itself is a participant in the safeguarding process under modern banking practice. Under this regular billing cycle, if a notice went out saying a bill had not been paid, a claim would be made to that effect, and the check pulled to show such payment. This canceled check would be traced within the banking cycle to find out where the funds went. Everything within the banking cycle is electronically traceable.

The testimony of this banking expert is that in the deposit situation tellers are not responsible for determining the legal effect of a series of endorsements. They simply are to see that endorsements exist. Tellers are expected to fan for endorsement to confirm that the items submitted to them have been endorsed.

"The law places the risk of loss from forged endorsements on the drawee bank unless it can affirmatively prove the drawer's negligence and its own due care." *Perley* v. *Glastonbury Bank & Trust Co.,* 170 Conn. 691, 703, 368 A.2d 149 (1976). Under the provisions of § 42a-3-406 of the Uniform Commercial Code a person is precluded from asserting that his signature is unauthorized in those cases in which his negligence contributed substantially to the making of the unauthorized signature. If his negligence did substantially contribute, the person whose name was signed is precluded

from asserting the lack of authority against a holder in due course or against a drawee or other payor who paid "in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

The question to be answered under the rule of *Perley* v. *Glastonbury Bank & Trust Co.*, supra, is whether Dunham-Bush was negligent in the manner in which it handled receipts or its receivables and, if so, whether that negligence contributed substantially to the making of the unauthorized signature which CBT acted upon in "good faith" and in the exercise of its own due care, due care in this context meaning in accordance with reasonable business practices in the banking industry.

Dunham-Bush has established that payment by CBT on the six corporate checks was under a forged endorsement. In order to avoid liability, CBT must prove that Dunham-Bush's negligence contributed substantially to the making of the unauthorized endorsements and that CBT itself was in the exercise of due care when it acted on the unauthorized endorsements. On the facts found, we conclude that CBT has carried its burden of proof. We find that Dunham-Bush's daily office procedure for handling receipts on its receivables at the time the defalcations occurred, the concentration in one person of authority for dealing at three levels with receivables, and the failure to act on the auditor's recommendations, which specifically addressed the procedures under which the defalcations took place, constituted that degree of negligence which substantially contributed to the making of the unauthorized endorsements.

We find that the procedure followed by CBT in the handling of its deposits is reasonable in the context of modern banking where checks have taken on a new

importance as an accepted exchange media. A multiplicity of teller stations have evolved to handle this volume and we have seen the evolution into an electronic mode operation. As a result of this, banking procedure at the teller level focuses on the last endorser. This is the one who has received the proceeds of the check and to whom the electronic trail will lead. Modern banking practice considers the safeguards of the business billing cycle and has structured its procedures accordingly. The customer is a participant in this safeguarding process. Under the rule of *Perley* v. *Glastonbury Bank & Trust Co.*, supra, so long as the customer's own actions do not substantially contribute to the payment by the bank of a forged endorsement, the bank must make the customer whole even though the bank itself was in the exercise of due care when it paid on the forged endorsement.

The court concludes that the defendant has prevailed by a preponderance of the evidence on the issue of the plaintiff's negligence and its own due care and has thus successfully defended against all five counts of the complaint.

Judgment is rendered on the complaint for the defendant Connecticut Bank and Trust Company and against the plaintiff Hartford Accident and Indemnity Company.